[Crim. No. 7857. Second Dist., Div. Two. Oct. 16, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. FRANK PEREZ ORTIZ, Defendant and Appellant.

Cary G. Branch, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Otto J. Hetzel, Deputy Attorney General, for Plaintiff and Respondent.

FOX, P. J.—Appellant and his wife Lupe were charged in an indictment with possession of a narcotic (heroin) in violation of section 11500, Health and Safety Code. It was also charged that appellant had suffered three prior felony convictions, two of which were for burglary; the third involved narcotics.

Both appellant and his wife were found guilty as charged.[1] The court also determined that the alleged prior convictions were true. Appellant's motion for a new trial was denied. He was sentenced to the state prison. He has appealed from the judgment and order denying his motion for a new trial.

In the summer of 1960, Officer Salagi of the Los Angeles Police Department, Narcotics Division, received information that appellant and another person were selling narcotics; that appellant resided at 961 South Duncan Street in Los Angeles. Thereafter the officer made an investigation. He determined that appellant had previously been convicted of a narcotics charge. He observed a 1958 Thunderbird parked in front of the above address, which was registered to appellant.

On October 17 the officer observed a truck in the driveway at the Duncan Street address with some furniture on it. Appellant was on the truck and someone was bringing furniture out of the house to him. The officer followed the truck to 1113 North Stone Street, where the furniture was unloaded and taken into the house. The officer thereupon "staked out" this location. For a period of approximately 10 days appellant's car was seen parked in front of the Stone Street address early in the morning and at various other times throughout this period. During this surveillance period cars were seen parked in the immediate vicinity of the Stone Street residence, which were registered to persons who had a narcotics record. Upon an occasion only a couple of days before appellant's arrest, the officer identified Robert Ramirez, who was going through the motions of cutting the hedge with a pair of clippers. He would go into the house for a while and come out again but it appeared to the officer that he always came

---

[1] Mrs. Ortiz's conviction is not involved in this appeal.

to the same location and cut the hedge at the same place all the time. While Ramirez was thus engaged, he would look back and forth, up and down the street. The officer later ascertained that Ramirez was a narcotic addict.

On the day before appellant's arrest, one Arthur Pepper, a narcotics user, was seen to enter the Stone Street residence. Appellant was not present at that time. Pepper remained there until appellant returned some 25 minutes later in a small truck that had some furniture on it. Appellant parked the truck at the curb. He and Pepper removed the furniture from the truck. Later they went into the house. After remaining there a while, Pepper left. He was intercepted by the officers some blocks away. When the officers identified themselves, Pepper immediately put his hand in his pocket and attempted to bring it up to his mouth. At that point the officers grabbed him and after a struggle they obtained two contraceptives which contained a white powder that proved to be heroin. When questioned by the officers as to where he got it, he stated, ''Well, I can't tell you that.'' Officer Salagi said, ''Well, we know where you got it. We were watching you. You got it from Frank [appellant], didn't you?'' Pepper replied, ''I can't tell you that.'' The officer then said, ''Well, we have been watching you'' and asked him why it took so long for him to score. Pepper replied, ''I had to wait for the man to come home.'' The officer then inquired, ''Well, was the man Frank Ortiz?'' Pepper stated, ''I can't tell you that. You guys know what happened.'' Pepper was thereupon arrested.

After arresting Pepper, the officers went back to the Stone Street location at approximately 3 p. m. Appellant had left with the small truck. They kept the place under observation until 4 o'clock in the morning. At about 8 p. m. that evening, appellant pulled his T-bird up to the house with another person in it. He stayed only approximately five minutes and then left. He did not again return that night while the officers had the place under surveillance. The officers returned at approximately 8:50 the next morning. Neither the truck nor the T-bird was there. However, appellant returned to the home at approximately 11 o'clock that morning. He parked across the street from the residence, and went into the house.

A few minutes later Sergeant Sanchez with two other officers approached the front of the residence while Officer Salagi went to the rear door. Sergeant Sanchez observed appellant, who was walking out of the front door. He took

two or three steps outside the door which was wide open behind him. As the sergeant approached, appellant ran back to the door, "straddled" the entrance and placed a hand on each door jamb. He was facing the sergeant and his body was "blocking the entranceway." Appellant "put his head back over his shoulders" and "in a shouting manner" stated in Spanish, "Look out, here they come." At this point the sergeant shoved appellant aside, entering the front room. He hesitated a moment and heard a door slam in the rear portion of the house. He immediately went in the direction from which this sound came.

Officer Salagi, who was at the rear of the house, also heard this same noise from within and concluded, based on his previous experience in investigating narcotic cases, that it came from the bathroom, the location of which had been previously ascertained. Salagi immediately entered from the rear and went directly to the bathroom, reaching there just ahead of Sergeant Sanchez. Salagi found the bathroom door closed. When he turned the knob on the door and pushed it open he found appellant's wife sitting on the commode. Instead of sitting straight on the commode like a person normally would, she was sitting at an angle of about 30 to 45 degrees. Officer Salagi ordered her to get up. She refused; whereupon the officer grabbed her left arm and pulled her off of the commode. At this point she flushed the toilet. As the water filled up and started to swirl, the officer observed a plastic bag in the water and reached in and grabbed it. It was found to contain 20 grams of heroin. The officers then searched the bathroom and found a capsule that also contained heroin.

The officers arrested both appellant and his wife. They did not have either a search warrant or a warrant for their arrest.

In a conversation with Sergeant Sanchez appellant stated that he did not live at the Stone Street address; that he and Lupe had been having some marital difficulties; that he had attempted a reconciliation with her but that he had rented a motel room on Whittier Boulevard just east of Atlantic approximately a week earlier; that he had stored some of his clothing there; and that he had been commuting between there and the house on Stone Street. The officers searched the motel and found two or three suitcases with appellant's clothing in them and a couple of coats hung in the closet. Appellant claimed that he did not know anything about the narcotics found in the toilet bowl. Appellant was asked if he knew a person by the name of Arthur Pepper. He stated that he

recalled vaguely a person by that name. He was asked when he last saw Pepper and stated, ''Well, it's been some time.'' The officer then asked him, ''Isn't it a matter of fact, that you saw him yesterday, on the 26th at about 3:00 p. m.?'' Appellant replied, ''No, I don't recall.'' The officer then stated that he had observed Pepper with appellant at the Stone Street residence, that he had seen Pepper help appellant unload the furniture that appellant had brought to that place. Appellant made no comment relative to this matter. The officer then informed appellant that Pepper was under arrest for possession of narcotics and that he had been seen talking to appellant shortly before his arrest. Appellant then remarked, ''Yes, I do recall now that I did talk to him yesterday but only for a short time.''

At the trial appellant denied he lived at the Stone Street house with his wife, claiming to be living at the motel on Whittier Boulevard and having all his belongings there due to the fact that he was having marital difficulties with his wife. Appellant explained his frequent presence at the Stone Street address by saying that he often went to see his daughter and that he had been engaged for some days in moving his wife's things into that home. He denied knowing either Lazano or Martin, each of whom had previously suffered a narcotics conviction and who had visited the Stone Street address. He also denied knowing Ramirez who had been seen pretending to trim the hedge. He admitted having known Pepper since around 1959. Pepper denied that he had purchased from appellant the narcotics found in his possession by the officers although he gave the appearance of recently having had a ''fix.'' He admitted this was true and that he had it in the basement of the Stone Street house; that it had been given to him by one Cardova who lived in the basement and who had the necessary equipment therefor. He claimed appellant was unaware of this. Appellant's wife also gave testimony seeking to absolve him from any connection with the narcotics that the officers found.

In seeking a reversal, appellant first argues that the evidence was illegally obtained on the theory that there was not sufficient showing to establish probable cause justifying the officers in entering and searching the Stone Street house, seizing the narcotics there found and arresting appellant.

A police officer may make an arrest without a warrant when he has probable cause for believing the person arrested has committed a felony. (Pen. Code, § 836; *People*

v. *Smith*, 50 Cal.2d 149, 151 [323 P.2d 435].) ''Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused.'' (*Bompensiero* v. *Superior Court*, 44 Cal.2d 178, 183 [281 P.2d 250].) Applying this test, the trial judge justifiably came to the conclusion that (excluding the information furnished by informants which will be discussed later) the officers had probable cause to enter the premises, make the search and arrest appellant and his wife. In this connection it should be noted that the weight to be accorded the facts and circumstances which the arresting officers had observed and acted upon in making the arrests was essentially for the trial court's determination in the exercise of a sound discretion. (*Lorenzen* v. *Superior Court*, 150 Cal.App.2d 506, 510 [310 P.2d 180].) Also, in determining whether there was evidence sufficient to justify the entry, search and seizure of the contraband and the arrests, the experience of the officers must be considered. (*People* v. *Whyte*, 199 Cal.App.2d 641, 645 [18 Cal.Rptr. 889].) This includes the common knowledge of police officers that a much-used method of getting rid of contraband is to flush it down a toilet. (*People* v. *Crowley*, 193 Cal.App.2d 310, 314-315 [14 Cal.Rptr. 112].) The officers were entitled to take into account the past criminal record of appellant and his association with known narcotics users and ''the fact that a person was found to be in possession of a narcotic shortly after he left the premises of the suspected person.'' (*People* v. *Perez*, 189 Cal.App.2d 526, 533 [11 Cal.Rptr. 456].) Furtive conduct on the part of a suspect may also be taken into account by the officers in determining their course of action.

 Here we have (1) men with prior narcotics records visiting the Stone Street house; (2) a user in possession of narcotics and showing evidence of having had a ''fix'' after having had a conversation with appellant at these premises and immediately after he had left there; (3) appellant's previous criminal record including a narcotics conviction; (4) appellant's attempt to block the doorway and thus prevent the officers from entering; (5) his exclamation, apparently directed to those in the house, ''Look out, here they come''; and (6) the sound of a door slamming which indicated to the officers who were experienced narcotics investigators, the likelihood that someone was attempting to dispose of contraband by flushing it down the toilet. The combination of these cir-

cumstances, viewed in the light of experienced police officers in making such investigations, amply support the trial court's determination that probable cause was established and justified the actions of the officers. The entry, search and seizure. and arrests were therefore legal and the evidence thus obtained was properly admitted.

Appellant argues that the court should have granted his motion to strike the arresting officer's testimony because the officer refused to reveal the identity of the person who supplied the information to the effect that appellant was dealing in narcotics. The law is established that it is not necessary to reveal the identity of an informer who merely points the finger of suspicion at a defendant where an arrest thereafter follows which is based solely upon observations by law enforcement officers which reasonably led them to believe a public offense was being committed in their presence. (*Scher* v. *United States*, 305 U.S. 251, 254 [59 S.Ct. 174, 83 L.Ed. 151]; *People* v. *Williams*, 51 Cal.2d 355, 359 [333 P.2d 19]; *People* v. *Alcala*, 169 Cal.App.2d 468, 471 [337 P.2d 558]; *People* v. *Alesi*, 169 Cal.App.2d 758, 761 [337 P.2d 838].) In the case at bench the acts of appellant that were observed by the officers constituted the basis for the officers' entrance, seizure of the evidence and arrest of appellant. The only function of the informant was to point the finger of suspicion at appellant which motivated the officers to "stake out" the residence on Stone Street. The court properly denied appellant's motion to strike the arresting officer's testimony.

 Appellant complains because the court refused to allow Pepper to give testimony to the effect that the officers tried to make a deal with him by which he would get a 90-day sentence provided he would testify that he bought the narcotics that were found on his person when he was arrested from appellant. This testimony was first offered on the question of probable cause. *Voir dire* examination, however, revealed that the asserted conversation regarding this matter took place at the time of Pepper's preliminary hearing. This, of course, was long after the search of the Stone Street house and the arrest of appellant. Obviously such testimony could have no relevancy whatever on whether or not the officers had probable cause for the search, seizure and arrest of appellant. Appellant's counsel[2] later sought to introduce this evidence on the theory of impeaching the testimony of the officers

[2]Appellant's counsel on appeal was appointed by this court and did not represent him at the trial.

and showing bias and prejudice on their part. Counsel, however, failed to lay a proper foundation for the admission of this evidence. Neither Officer Salagi nor Sergeant Sanchez was cross-examined with respect to the statements made by Pepper at the time of his arrest or as to statements which would have indicated that they were attempting to make a deal with him. The failure of counsel to lay such a foundation made the court's rejection of the offer of Pepper's testimony entirely proper. Apposite here is the statement of the court in *People* v. *Sweeney,* 55 Cal.2d 27 [9 Cal.Rptr. 793, 357 P.2d 1049] at page 37: ''Rather here there was not even a purported compliance with the established rule providing for impeachment of a witness 'by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done the statements must be related to him, with the circumstances of times, places, and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them.' (Code Civ. Proc., § 2052.) 'The methods prescribed in the code for the impeachment of a witness are exclusive.' [Citation.] The same reasons of fairness apply in an attempt to show bias or hostility from declarations of a witness as apply in contradictory or inconsistent statements; he must be given a full opportunity for explanation with his attention directed to the particulars set forth by section 2052. [Citations.]''

Finally appellant argues that the evidence is insufficient to sustain the judgment of conviction. In this connection it should be pointed out that appellant was convicted on the theory of aiding and abetting his wife in her unlawful possession of heroin. One who is present and is aware of the acts of the perpetrator of the crime and either by acts of encouragement or warning or by gestures aids or encourages the commission of the crime is an aider and abettor and may be charged as a principal. (*People* v. *Carlson,* 177 Cal.App.2d 201, 205 [2 Cal.Rptr. 117]; Pen. Code, § 31.)

 Here appellant frequented at various times of the day and night the residence of his wife at the Stone Street address. His personal belongings were often kept there although he also had a motel room elsewhere at which he had some of his clothing. It seems that he supplied the equipment for the Stone Street residence, supervised its maintainance and paid the bills. Appellant's association with other narcotic users, their frequenting the Stone Street residence and his prior narcotics conviction were circumstances to be considered

on the subject of appellant's knowledge that his wife possessed heroin. Finally, his efforts to block the entrance to the living room and his warning, ''Look out, here they come,'' apparently addressed to those inside the house, justify the inference that appellant knew that his wife was in possession of narcotics at the time the officers entered and that he sought to prevent her being apprehended in possession of the contraband. The evidence amply supports the implied finding that appellant was guilty of aiding and abetting his wife. He was therefore properly charged and convicted as a principal.

The judgment and order are affirmed.

Ashburn, J., and Herndon, J., concurred.