**UNITED STATES of America, Plaintiff,**

v.

**Mark Earl HENDERSON, Stacey Seacrist and Bernard Lee Brumfield, Defendants.**

**Criminal Action No. 2:99–00214.**

United States District Court, S.D. West Virginia, Charleston Division.

March 23, 2000.

Monica K. Schwartz, Assistant United States Attorney, Charleston, WV, for U.S.

Matthew A. Victor, Charleston, WV, for Mark Earl Henderson.

Vickie R. Dodd, Charleston, WV, for Stacey Seacrist.

Jacqueline A. Hallinan, Charleston, WV, for Bernard Lee Brumfield.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

At the pretrial motions hearing held in this matter on March 21, 2000, the court suppressed defendant Stacey Seacrist's statements that had been obtained by police in violation of her Fifth Amendment right to counsel. The court learned at the hearing that those statements formed the sole basis for a search warrant for the residence of defendant Mark Henderson. The court took under advisement the effect that Seacrist's illegally obtained statements had on the validity of the search warrant and the admissibility of evidence obtained in its execution. The court further ordered the parties to submit briefs on these issues. Henderson, Seacrist, and their co-defendant, Bernard Brumfield, have complied with this order in the form of motions to suppress the evidence seized from Henderson's residence in the execution of the warrant. The court writes to explain its ruling on the matters it took under advisement and, for the reasons set forth herein, **GRANTS** Seacrist's motion and **DENIES** the motions filed by Henderson and Brumfield.

## I.

On March 15, 2000, a federal grand jury returned a five-count second superseding indictment charging the defendants as follows: 1) Count One charges Henderson, Seacrist, and Brumfield with conspiracy to manufacture and distribute methamphetamine and to distribute marijuana in violation of 21 U.S.C. § 846; 2) Count Two charges Henderson with money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2; 3) Count Three charges Henderson and Brumfield with attempting to possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2; 4) Count Four charges Henderson and Seacrist with attempting to manufacture methamphetamine in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2; and 5) Count Five charges Henderson with the possession, carrying, and use of a firearm in connection with a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1) and 2.

At the pretrial motions hearing, one of the many motions addressed by the court was Seacrist's motion to suppress evidence obtained from her on October 8, 1999 during a traffic stop that ended in her arrest. Seacrist argued that evidence seized and statements she made to the police during the stop and arrest should be suppressed as violating her rights under the Fourth and Fifth Amendments. Testimony from Seacrist and from several West Virginia State Troopers revealed the following sequence of events regarding the traffic stop and subsequent arrest.

On October 8, 1999, Trooper Simpson of the West Virginia State Police was on road patrol when he got behind a Ford Mustang

that did not have a license plate light or brake lights. The vehicle was also missing the rear window to the convertible top. Simpson ran a search of the vehicle's tags and discovered that the vehicle was stolen. At that point, he stopped the Ford Mustang and approached the vehicle. Seacrist was the only person in the vehicle, and she appeared nervous when the officer approached. Simpson detected a strong odor of marijuana coming from the vehicle.

Simpson asked Seacrist for her license, proof of insurance, and vehicle registration card. Seacrist produced only the license and advised Simpson that the vehicle belonged to her boyfriend, defendant Henderson. She also stated that she was en route to Henderson's residence. Simpson then asked Seacrist if she had any drugs or weapons in the vehicle. She responded that she did not.

Simpson returned to his vehicle and ran Seacrist's driver's license and the Ford Mustang's vehicle identification number through West Virginia State Police communications. Senior Trooper Elmore and Senior Trooper Zerkle overheard Simpson's radio communication, and Elmore then advised Simpson that he had an outstanding arrest warrant for Seacrist for possession of methamphetamine.

The outstanding warrant had arisen out of a prior traffic stop conducted by Elmore on June 9, 1998. On that day, Elmore stopped a vehicle occupied by Seacrist and Henderson, and Seacrist voluntarily gave Elmore methamphetamine that she had in her possession. Although Elmore did not arrest Seacrist, he requested that she come to the police station the next day to discuss the methamphetamine. The next day, Seacrist arrived at the station with two attorneys, who prevented Elmore from speaking directly to Seacrist. Elmore subsequently obtained the warrant for Seacrist's arrest.

Upon learning about the outstanding warrant resulting from the June 9, 1998 traffic stop, Simpson asked Seacrist to get out of the car, informed her that she was

under arrest, and conducted a search of her person for weapons or contraband. The search revealed a small plastic bag of methamphetamine in Seacrist's front pocket. Simpson asked her what it was, and she responded that it was methamphetamine. At this point, Senior Trooper Elmore and Senior Trooper Zerkle arrived at the scene.

Simpson then asked Seacrist if he could search the vehicle, and Seacrist advised Simpson that he could search it and that she had a pipe in the front of the vehicle. She indicated that she used the pipe to smoke methamphetamine. Simpson placed Seacrist in his police cruiser and then, aided by Elmore and Zerkle, searched the vehicle driven by Seacrist. He found a pipe in the front of the vehicle and several bottles of hydrogen peroxide and pills in the trunk. The officers recognized that, based on the large quantity of peroxide and pills, those substances were linked to the manufacture of methamphetamine. The officers did not complete an inventory of the items found.

Based on the fact that the vehicle did not contain insurance information or an inspection sticker and that it had defective brake and license plate lights, the officers determined that it was necessary to tow the vehicle pursuant to West Virginia State Police policy. Once the vehicle was towed, West Virginia State Police policy required an inventory search of the vehicle. It was at that point that the items found in the car would be inventoried.

Having completed the search of the vehicle at the scene of the traffic stop, Trooper Elmore approached Seacrist and stated to her that there was a large amount of hydrogen peroxide in the trunk. Seacrist responded that she was taking it to Henderson's residence to cook methamphetamine. Elmore knew that Seacrist had retained an attorney in connection with events surrounding the prior traffic stop that resulted in the warrant for which she had just been arrested. Elmore testi-

fied at the motions hearing that he therefore asked Seacrist if she wanted her attorney, to which she replied "yes." He further testified that he then asked Seacrist if she had her attorney's phone number, and she advised him that she did not. Elmore admitted in his testimony that he did not provide Seacrist with an opportunity to call her attorney at any time during the stop or while she was in custody.

After the above-described conversation between Elmore and Seacrist, Trooper Simpson transported Seacrist to the police station. At that point, Elmore read Seacrist her *Miranda* warnings and Seacrist signed a *Miranda* warning and waiver form. The court notes that although Seacrist provided confusing testimony to the effect that she did not sign a *Miranda* form, the court credits the troopers' testimony in this regard.

After waiving her *Miranda* rights, Seacrist refused to make a written statement because she feared that her boyfriend, Henderson, would beat her as· he had in the past. Seacrist did, however, respond to the troopers' questions and inform them that she had purchased the peroxide and pills. She further reiterated that she had been en route to Henderson's residence with those items so that she and Henderson could manufacture methamphetamine. By this point, Elmore had initiated the process of obtaining a search warrant for Henderson's residence.

Elmore was successful in obtaining the search warrant based upon Seacrist's statements that she purchased the peroxide and pills for use in the manufacturing of methamphetamine and that she was taking them to Henderson's residence so that they could in fact manufacture methamphetamine. *See* Hrg. Seacrist Ex. # 4. The police executed the search warrant on October 8, 1999. They recovered further evidence of an attempt to manufacture methamphetamine.

## II.

At the pretrial motions hearing, the court made the following rulings concerning the admissibility of Seacrist's statements and the evidence seized during the October 8, 1999 traffic stop and arrest.

■ The court credited Trooper Simpson's testimony that he had a valid reason to initiate the traffic stop. The statements made by Seacrist when Simpson first approached the car are therefore admissible. When Simpson was alerted to the outstanding warrant for Seacrist's possession of methamphetamine, he immediately arrested her, searched her person, and found methamphetamine. The methamphetamine is admissible because it was obtained during a lawful search incident to arrest.

After discovering the methamphetamine on Seacrist's person, Simpson asked her what it was. Seacrist replied that it was methamphetamine. Before Simpson searched the vehicle, Seacrist told him that the vehicle contained a pipe used for smoking methamphetamine. The issue of the admissibility of these un-*Mirandized* statements by Seacrist raises questions not addressed by the court at the motions hearing. Specifically, the court must determine whether the statements are admissible in light of the Fourth Circuit's recent holding in *United States v. Dickerson*, 166 F.3d 667 (4th Cir.), *cert. granted in part*, —— U.S. ——, 120 S.Ct. 578, 145 L.Ed.2d 481 (1999), which provides that admissibility of confessions in federal court is governed by 18 U.S.C. § 3501 rather than *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The court is not aware if the United States intends to introduce Seacrist's statements at trial. Accordingly, the court reserves ruling on the admissibility of the statements.

Trooper Elmore's testimony at the motions hearing made it abundantly clear that Seacrist asked for her previously retained lawyer when arrested on October 8,

1999. Further, Elmore was aware that Seacrist had in fact retained counsel in connection with the possession of methamphetamine charge for which she had just been arrested.

■■■ The Fifth Amendment protects a "suspect's desire to deal with the police only through counsel." *United States v. Melgar*, 139 F.3d 1005, 1010 (4th Cir.1998) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)). Once a suspect invokes the right to counsel, police must refrain from questioning her not only about the previously charged conduct, but also "regarding any offense unless counsel is present." *Id.* (quoting *McNeil*, 501 U.S. at 177, 111 S.Ct. 2204). Trooper Elmore, aware that Seacrist had an attorney in connection with the possession charge, was therefore prohibited from interrogating Seacrist not only about that charge, but also about the newly discovered peroxide located in the trunk. Further, once Seacrist specifically stated that she desired counsel, all other officers were also prohibited from interrogating her in the absence of counsel. The court thus found that all statements made by Seacrist after Elmore walked up to her and began an interrogation by asking her to comment on the quantity of peroxide were made in violation of her Fifth Amendment right to counsel.

■■■ Those statements are therefore "presumed involuntary and ... inadmissible as substantive evidence at trial." *Id.* (quoting *McNeil*, 501 U.S. at 177, 111 S.Ct. 2204). This remains true even though Seacrist reiterated those statements after receiving her *Miranda* warnings and executing a waiver of her rights. *See id.* (stating that statements are inadmissible "even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards" (quoting *McNeil*, 501 U.S. at 177, 111 S.Ct. 2204)). The court therefore did not find it necessary to ascertain whether Seacrist's waiver of her *Miranda* rights was valid. Accordingly, the court suppressed all statements made by Seacrist after Elmore approached her for purposes of interrogation.

The Fourth Circuit's recent decision in *United States v. Dickerson* does not affect the court's ruling regarding the admissibility of Seacrist's statements. This is because *Dickerson* held only that the admissibility of confessions in federal court is governed by 18 U.S.C. § 3501 rather than *Miranda*. *Dickerson*, 166 F.3d at 695. The holding was that the irrebuttable presumption created by *Miranda*—"that a confession obtained without the [*Miranda*] warnings is presumed involuntary—is a fortiori not required by the Constitution." *Id.* at 690. The court finds that *Dickerson* has no bearing on the Fifth Amendment right to counsel question presented here.

■■ The court further ruled at the motions hearing that the pipe, hydrogen peroxide, and pills found in the vehicle Seacrist was driving are admissible. The vehicle was properly impounded, and the West Virginia State Police has a written policy regarding vehicle inventory searches. Because an inventory search would have inevitably revealed the pipe, hydrogen peroxide, and pills, the inevitable discovery doctrine applies and the court finds it unnecessary to discuss the ramification of *Dickerson* or the application of *Miranda* in this circumstance.

### III.

Following these rulings, the court took under advisement the effect the suppression of Seacrist's statements would have on the subsequent search warrant for Henderson's residence and the evidence obtained in its execution. Specifically, the court must determine whether that evidence is admissible against each defendant.

■■■ The exclusionary rule operates to bar evidence obtained either directly or indirectly from unlawful police action. *See*

*Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In determining whether to apply the "fruit of the poisonous tree" doctrine, a court must determine whether "the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488, 83 S.Ct. 407 (citing Maguire, *Evidence of Guilt,* 221 (1959)). The search warrant for Henderson's residence was based solely on the statements made by Seacrist that this court has determined are inadmissible. The inadmissible statements therefore led directly to the warrant, which in turn led directly to the seizure of additional evidence of methamphetamine manufacturing. The evidence seized during the execution of the search warrant is therefore a fruit of Seacrist's poisonous confession tree and is not admissible against her at trial.

■ Henderson and Brumfield request the court to render the evidence inadmissible against them as well pursuant to the "fruit of the poisonous tree" doctrine. The interrogation of Seacrist that led to the warrant and its execution did not violate the constitutional rights of Henderson or Brumfield. They therefore lack standing to use the illegal interrogation of Seacrist as a ground for challenging the search warrant and the evidence seized during its execution. *See id.* at 492, 83 S.Ct. 407 (determining that although seizure of heroin from Yee resulted from unlawful police action, the seizure did not invade Wong Sun's rights and he was therefore not entitled to object to its use at his trial); *Dearinger v. Rhay,* 421 F.2d 1086, 1088 (9th Cir.1970) (holding that Dearinger did not "have standing to urge the illegality of Miller's arrest [, statements from which provided the basis for a search warrant of Dearinger's home], and the 'poisonous fruit' thereof, as a ground for challenging the warrant to search his home"). Accordingly, the court finds that evidence seized during the execution of the search warrant of Henderson's residence is admissible against Henderson and Brumfield.

## IV.

Prior to the pretrial motions hearing, the court learned that it may become necessary to sever Henderson from his co-defendants pursuant to the Supreme Court's decision in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The United States had informed the court of statements made by both Seacrist and Brumfield that incriminate Henderson. The United States indicated that it may introduce those statements at trial. The Assistant United States Attorney agreed to advise the court by 4 p.m. on March 22, 2000 whether severance was necessary. She has not done so.

■ The court's above ruling concerning the admissibility of evidence seized during the execution of the search warrant of Henderson's residence presents the court with another ground for severance. When assessing the merits of severance, the court must balance the possibility of specific and compelling prejudice to the defendant against the public interest in judicial efficiency and economy. The court ruled above that the evidence seized was admissible against Henderson and Brumfield but inadmissible against Seacrist. There is a large risk that the jury would be confused if this evidence is admissible against two members of the alleged conspiracy but inadmissible against another member. The court therefore finds that a joint trial would severely prejudice Seacrist. Accordingly, the court severs Seacrist from Henderson and Brumfield. The determination of whether Brumfield will be severed from Henderson will depend upon whether the United States intends to introduce at trial Brumfield's incriminating statements.

## V.

For the foregoing reasons, the court **GRANTS** Seacrist's motion and **DENIES**

the motions filed by Henderson and Brumfield to suppress the evidence seized from Henderson's residence in the execution of the warrant. Based on this ruling, the court **SEVERS** Seacrist from Henderson and Brumfield. The court **DIRECTS** the Assistant United States Attorney to notify the court immediately of the government's intention regarding the introduction of Henderson's incriminating statements so that the court can determine if further severance is necessary and establish the order of the individual trials. Although the court previously announced the order of trials in response to a question posed by counsel, all parties should be prepared for trial on March 28, 2000. The court will immediately notify counsel of the trial schedule upon notice of the government's intention regarding the use of Brumfield's statements at trial.